Filed 9/28/23  P. v. Villagomez CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTIAN VILLAGOMEZ,<br><br>    Defendant and Appellant. | H050412<br>(Monterey County<br> Super. Ct. No. SS130804A) |

In 2014, defendant Christian Villagomez pleaded no contest as an aider and abettor to an attempted murder of one person (Pen. Code, §§ 664, 187[1]) and an assault with a semiautomatic firearm against another person (§ 245, subd. (b)).  Villagomez also admitted an allegation that he committed the attempted murder for the benefit of a criminal street gang (§ 186.22, subd. (b)).  As part of his plea, Villagomez personally stipulated that he "aided and abetted in the shooting, with a semi-automatic firearm, of two people in King City with the intent to kill at least one of them and [he] did this for the benefit of . . . the Norte[ñ]o criminal street gang with the specific intent to promote . . . criminal conduct by gang members."

---

[1] Unspecified statutory references are to the Penal Code.

In 2022, Villagomez filed a petition to vacate his attempted murder conviction and be resentenced under former section 1170.95 (hereafter petition).[2] The trial court denied the petition, ruling that Villagomez failed to make a prima facie case for relief.

In this appeal, Villagomez makes several arguments challenging the trial court's denial of his petition, including that his stipulation is ambiguous and does not establish, as a matter of law, that he directly aided and abetted the attempted murder of the victim named in that count.

For the reasons explained below, we agree. We reverse the trial court's order and remand with directions to issue an order to show cause and conduct further proceedings under section 1172.6.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Complaint and Preliminary Hearing*

On April 23, 2013,[3] the Monterey County District Attorney filed a complaint charging Villagomez and a codefendant, Salomon Arevalo Zuniga, with the willful, deliberate, and premeditated attempted murder of "John Doe 1" (§§ 664, subd. (a), 187 subd. (a); count 1), shooting at an inhabited dwelling (§ 246; count 2), assault with a deadly weapon against John Doe 1 (§ 245, subd. (a)(1); count 3), assault with a deadly weapon against "John Doe 2" (§ 245, subd. (a)(1); count 4), assault with a deadly weapon against "Jane Doe 1" (§ 245, subd. (a)(1); count 5), and street terrorism (§ 186.22, subd. (a); count 6). (Some capitalization omitted.) For counts 1 through 5, the complaint

---

[2] Effective January 1, 2022, the Legislature amended section 1170.95 in several respects, including to "clarify[] that, in some circumstances, the same relief available to persons convicted of murder is also available to persons convicted of attempted murder." (*People v. Birdsall* (2022) 77 Cal.App.5th 859, 865 (*Birdsall*); see Stats. 2021, ch. 551, §§ 1, 2.) The Legislature later renumbered section 1170.95 as section 1172.6, with no change to the text of the statute (Stats. 2022, ch. 58, § 10, eff. June 30, 2022). In this opinion we refer to the current version of any relevant provisions now codified in section 1172.6.

[3] Unless otherwise indicated, all dates were in 2013.

2

alleged the charged offenses were committed by Villagomez and Zuniga for the benefit of a criminal street gang (gang enhancement) (§ 186.22, subd. (b)(1)(B), (4)). All the offenses charged occurred on April 17.[4]

On December 13, the court held a joint preliminary hearing for Villagomez and Zuniga. The prosecution presented one witness, King City Police Officer Jose Perez.

Officer Perez testified that on the night of April 17, he responded to a shooting on a street in King City. He observed "Victim 1" sitting on the ground with a gunshot wound to his ankle and his girlfriend applying pressure to it. Perez also saw "Victim 2" (a friend of Victim 1) seated in the driver's seat of a Toyota 4Runner. Victim 2 had been shot in his left arm and abdomen, and Perez later learned Victim 2 suffered paralysis because of the shooting. In addition, Perez observed several bullet holes in the left side of the Toyota and some cartridge cases "[n]ear the area of the shooting." Perez knew Victim 1 to be a former Sureño gang member but did not know the gang status of Victim 2.

Victim 1 told Officer Perez that while he (Victim 1) was standing next to Victim 2's vehicle, he noticed a two-door white Honda driving toward them. As the Honda approached, Victim 1 heard several gunshots, dove out of the way, and was struck in the ankle. He observed the gunshots being fired from the right, passenger side of the Honda as it drove by.

A short time later, in the city of Greenfield, the police pursued and stopped a car that matched the description of the white Honda. Villagomez and his brother Cesar were inside the car. Officer Perez searched the Honda and found "four spent casings." The

---

[4] Because Villagomez and Zuniga were 17 years old on the date of the charged offenses, the complaint included allegations under then-current Welfare and Institutions Code section 707, subdivision (d), permitting the district attorney to file an accusatory pleading in a criminal court against minors accused of certain crimes.

police also found a wallet containing codefendant Zuniga's Greenfield High School identification card. Later, the police located two more cartridge cases inside the Honda.

Three days after the shooting, on April 20, Officer Perez and a fellow sergeant interviewed Zuniga after he waived his *Miranda* rights.[5] According to Perez, Zuniga initially was not honest with the officers. Eventually, Zuniga admitted that he had been involved in the shooting. Zuniga explained to the officers that on the evening of April 17, he had received a call from "Villagomez saying that they were going to pick him up and they were going to drive to King City." Thereafter, Zuniga got into the right rear passenger seat of the white Honda. Villagomez was driving the car, Christian Nava was in the front passenger seat, and Villagomez's brother Cesar was in the left rear passenger seat. According to Zuniga, once he got into the car, Villagomez handed him a gun that was wrapped in a towel. As they drove toward King City, Villagomez said that they were going to "do a shoot." Zuniga checked the gun to see if it was loaded. The gun had six rounds in the magazine, and Zuniga chambered a round by racking the slide.

Zuniga told the officers that he and his confederates drove around King City. As they did so, Zuniga saw a black Jeep or similar type vehicle and "Villagomez told him 'just shoot.' So he shot." Zuniga fired four to five rounds, and Nava fired about five or six rounds. The group then headed back toward Greenfield "on the back roads," but a police officer spotted and pursued them. Villagomez threw the guns out of the car. Nava jumped out of the car, and Zuniga jumped out, leaving his wallet.

Officer Perez testified further as an expert on the investigation of Norteño gang-related crime. Perez explained that Norteños and Sureños are rivals, and King City is a Sureño town. He discussed predicate offenses committed by individuals who he believed were Norteño gang members and opined that the Norteños' primary activities were robbery and assault with force. Perez further opined that Zuniga, Villagomez, and Nava

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

were Norteño gang members and the shooting had been committed to promote and assist that gang. However, Perez testified that when he spoke to Villagomez, he denied being affiliated with a gang. Regarding the current crime, Perez explained that Villagomez had told him that on the evening of April 17, Nava contacted Villagomez and reported getting into a fight with a Sureño gang member at school that day. Perez added, "[a]nd they had told them he knew where he live[d] and they were going to go to King City and look for him and retaliate." Perez testified further that neither Victim 1 nor Victim 2 had been involved in the fight at Nava's school.

At the conclusion of Officer Perez's testimony, the court held Villagomez and Zuniga to answer on all counts and allegations stated in the complaint.

B. *Information, Plea, and Sentencing*

On November 21, 2014, the district attorney filed an amended information (information) charging Villagomez and Zuniga with attempted murder of "John Doe #1" (§§ 664, subd. (a), 187 subd. (a); count 1), shooting at an inhabited dwelling (§ 246; count 2), assault with a firearm against John Doe #1 (§ 245, subd. (a)(2); count 3), assault with a semiautomatic firearm against "John Doe #2" (§ 245, subd. (b); count 4), and assault with a firearm against "Jane Doe #1" (§ 245, subd. (a)(2); count 5).[6] (Some capitalization omitted.) For counts 1 through 5, the information alleged gang enhancements as to Villagomez and Zuniga (§ 186.22, subd. (b)(1)(B), (4)). In addition, by contrast to the complaint, for count 1, the information also alleged that Zuniga (alone) had personally used a firearm (§ 12022.5, subd. (a)).

On the date the information was filed, in exchange for a stipulated aggregate prison sentence of 21 years, Villagomez pleaded no contest to attempted murder of John Doe #1 (count 1; 9-year term) and assault with a semiautomatic firearm against John Doe #2 (count 4; 2-year term) and, further, admitted a gang enhancement allegation (attached

[6] The information included a sixth count charging Zuniga (alone) with street terrorism (§ 186.22, subd. (a); count 6).

5

to count 1; 10-year term).[7]  The clerk's minute order for the change of plea proceeding states, "Upon stipulation of [c]ounsel, [the] court finds a factual basis for the plea based on [the] preliminary hearing transcript and the signed written waiver of rights and plea form."

In a waiver of rights/plea document (written on the district attorney's pleading paper), Villagomez agreed to the following stipulation:  "I agree and stipulate that there is a factual basis for all charges, special allegations and enhancements to which I am pleading guilty or no contest, and the factual basis is that on April 17, 2013, I aided and abetted in the shooting, with a semi-automatic firearm, of two people in King City with the intent to kill at least one of them and I did this for the benefit of, at the direction of or in association with the Norte[ñ]o criminal street gang with the specific intent to promote, further or assist criminal conduct by gang members causing this offense to be felony conduct which would also be a violation of Penal Code section 186.22.  The details are described in King City Police report 130433."[8]

In a separate preprinted waiver of rights/plea form, Villagomez endorsed the following statement:  "I agree there is a factual basis for the plea and that I am responsible for committing each element of each crime to which I plead guilty or no contest and of each special allegation I admit."  Villagomez also endorsed this statement:  "I further understand that a plea of no contest is the same as a plea of guilty for all

---

[7] The record on appeal includes a clerk's minute order for the November 14, 2014 "Change of Plea" proceeding but not a corresponding reporter's transcript.  Furthermore, the November 14, 2014 minute order appears to contain an error in that it states Villagomez admitted the gang enhancement allegation attached to count 4.  The written waiver of rights/plea documents, however, indicate that Villagomez in fact admitted the gang enhancement allegation attached to count 1, which enhanced his sentence by 10 years (see § 186.22, subd. (b)(1)(C)).

[8] The King City Police Department report referenced in the stipulation does not appear in the appellate record.  However, the probation officer's report includes a summary of the "circumstances of the offense" (capitalization, boldface & underscoring omitted) based on that police report.

6

purposes." Villagomez "offer[ed] to the court" the "[p]reliminary [h]earing [t]ranscript" and the "[p]lea form" (presumably referring to the separate waiver of rights/plea document) "as a basis for [his] plea and admissions."

In January 2015, pursuant to the stipulated sentence, the trial court sentenced Villagomez to 21 years in prison, comprising the upper term of nine years for count 1, two years (one-third of the middle term) consecutive for count 4, and 10 years consecutive for the gang enhancement. The court dismissed the remaining counts and allegations.

C. *Proceedings on Petition for Resentencing*

In January 2022, Villagomez, on his own behalf, filed a preprinted petition for resentencing. Villagomez declared, inter alia, that an information had been filed against him which allowed the prosecution to proceed under the natural and probable consequences doctrine and that he could not now be convicted of attempted murder because of the changes to sections 188 and 189 effective January 1, 2019. Upon Villagomez's request, the trial court appointed counsel to represent him.

The district attorney filed an opposition to the petition arguing that Villagomez failed to make a prima facie showing for relief. The district attorney noted that when Villagomez pleaded no contest to attempted murder in November 2014, he signed a waiver of rights/plea document stipulating to, inter alia, aiding and abetting in the shooting of two people with the intent to kill at least one of them. The district attorney asserted that the "record of conviction refutes [Villagomez]'s contention that he could not be convicted of attempted murder based on the changes to sections 188 and 189" and "shows that with the intent to kill[, Villagomez] aided and abetted the actual killer." The district attorney further asserted that "the record of conviction in this matter clearly refutes the claim that [Villagomez] was prosecuted under the theory of natural and probable consequences. Rather, the theory was that [Villagomez] had the intent to kill when he aided and abetted the actual killer."

7

Villagomez replied to the district attorney's opposition. He asserted that "his admissions in this case do not bar possible resentencing because the law of aiding and abetting was different at the time of his plea and was broad enough to include liability under the natural and probable consequences doctrine. As such, his admission to aiding and abetting a shooting meant something different at the time of his plea and does not render him ineligible for relief under [section 1172.6, subdivision (a)(3)]." Villagomez further claimed that "there is a factual dispute that must be resolved at an evidentiary hearing," in that "the natural and probable consequences doctrine could have imputed the missing intent [to kill] to Villagomez." Additionally, Villagomez contended that the trial court could "review court documents to ascertain foundational facts, such as the charges, nature of the plea, and any factual admissions made by the defendant. Anything more extensive is disallowed."

On September 21, 2022, the trial court held a hearing on Villagomez's petition. At the beginning of the hearing, the court stated its tentative ruling: "So, in this case, we have a plea form. I agree, [defense counsel], that in reading the preliminary hearing there are a variety of theories of liability that could get to an attempted murder charge or a [section] 245 charge under a natural and probable consequence theory aiding and abetting a lesser crime. [¶] We do have in this case a plea form where the defendant signed, and this is a quote, 'I aided and abetted in the shooting with a semiautomatic firearm of two people in King City with the intent to kill at least one of them, and I did this for the benefit of[,] []at the direction of or in association with the Norte[ñ]o criminal street gang with the specific intent to promote, further or assist in criminal conduct by gang members causing this offense to be felony conduct.' [¶] So, it seems to me, that that admission takes this case out of the [section 1172.6] relief. [¶] And I know, [defense counsel], you in your argument indicated that your client's admission to having an intent to kill did not bar relief because aiding and abetting a shooting with intent to kill might have had a different meaning at the time of the plea. [¶] So I don't know of any law that has

8

changed regarding intent to kill.  I think intent to kill meant the same in 2010, 2014 as now."

After hearing arguments from counsel, the trial court denied Villagomez's petition stating, "I am not going to find a prima facia showing that the defendant is entitled to relief."

Villagomez filed a timely notice of appeal.

## II.  DISCUSSION

On appeal, Villagomez makes several arguments challenging the trial court's denial of his petition.  He contends the trial court erred in relying on his stipulation because, under *Descamps v. United States* (2013) 570 U.S. 254, he "only admitted the elements of attempted murder and his acquiescence to the statement contained in the waiver of rights form cannot establish the particular theory underlying his conviction." He further asserts that the trial court's use of the stipulation is "contrary to the legislative intent and spirit of section 1016.8, which provides that plea agreement conditions that require the waiver of unknown future ameliorative reforms are not knowing and intelligent, as required, and are void as [] against public policy."

Additionally, Villagomez argues that even if a stipulation to the factual basis of a plea could establish the particular theory underlying an attempted murder conviction, his "stipulation does not establish that [he] intended to [] kill the victim of the attempted murder" count because the stipulation provided only that he "aided and abetted the shooting of 'two people' with 'the intent to kill at least one of them.' "  He claims that the trial court engaged in impermissible factfinding when concluding, based on the stipulation, that he intended to kill John Doe #1 and "by electing to rely upon the stipulation . . . instead of the stipulation in the [preprinted] plea form, which only admitted the bare elements of the offense."

Lastly, Villagomez contends that codefendant Zuniga's statements to the police (as testified to by Officer Perez at the preliminary hearing) cannot be used to deny his

petition at the prima facie stage because those statements were inadmissible under section 1172.6, subdivision (d)(3).

The Attorney General responds that "no court has held that trial courts are barred from considering factual admissions made personally by the petitioner" and Villagomez's "reliance on case law interpreting an unrelated federal statute is inapposite." The Attorney General further asserts that, under California precedent, the trial court correctly relied on Villagomez's admissions made in connection with his plea when finding that he failed to state a prima facie case for relief.

As we will explain, we must reverse the trial court's order denying Villagomez's petition because neither the stipulation nor any other information in the record conclusively establishes that Villagomez acted with the specific intent to kill John Doe #1, as is required for an attempted murder conviction under current law.

A. *Legal Principles*

1. <u>Section 1172.6</u>

Senate Bill No. 1437 (Senate Bill 1437) took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) "With the goal of 'more equitably sentenc[ing] offenders in accordance with their involvement in homicides' [citation], Senate Bill 1437 significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill anyone, including those prosecuted on a felony-murder theory." (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*).) "The bill also altered murder liability under the natural and probable consequences doctrine." (*Ibid*., fn. 8.)

As amended by Senate Bill 1437, section 188 provides in relevant part: "(a) For purposes of [s]ection 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189 [regarding the felony-murder

rule], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188.)

Regarding these amendments to murder law, our Supreme Court has explained, "Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*People v. Gentile* (2020) 10 Cal.5th 830, 848; see also *People v. Vang* (2022) 82 Cal.App.5th 64, 81; *People v. Ervin* (2021) 72 Cal.App.5th 90, 101.)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) When the trial court receives a petition under section 1172.6 requesting vacatur of a conviction and resentencing, and "containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Ibid.*, citing *People v. Lewis* (2021) 11 Cal.5th 952, 970–972 (*Lewis*), § 1172.6, subd. (c).) "Otherwise, the court must issue an order to show cause [citation] and hold an evidentiary hearing at which the prosecution bears the burden 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill 1437." (*Wilson, supra*, 14 Cal.5th at p. 869; § 1172.6, subd. (d)(3).)

During the prima facie stage of review under section 1172.6, subdivision (c), the trial court "may look at the record of conviction . . . to determine whether a petitioner has made a prima facie" showing. (*Lewis, supra*, 11 Cal.5th at p. 971.) "The record of conviction will necessarily inform" the prima facie inquiry as a means "to distinguish

11

petitions with potential merit from those that are clearly meritless." (*Ibid*.) However, the prima facie inquiry under section 1172.6, subdivision (c) is "limited." (*Ibid*.)

The court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*Lewis*, *supra*, 11 Cal.5th at p. 971.) " '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citation.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Ibid*.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id*. at p. 972.)

By its express terms, Senate Bill 1437 did not authorize a petition to vacate a conviction for any offense other than murder. After the enactment of Senate Bill 1437, the California Courts of Appeal were split on whether Senate Bill 1437 applied to attempted murder as well as murder. (See, e.g., *People v. Sanchez* (2020) 46 Cal.App.5th 637, review granted June 10, 2020, S261768 [holding that attempted murder is included in Sen. Bill 1437]; *People v. Lopez* (2019) 38 Cal.App.5th 1087, review granted Nov. 13, 2019, S258175 [holding that attempted murder is not included in Sen. Bill 1437].)

"In October 2021, the Governor signed Senate Bill No. 775, (Stats. 2021, ch. 551, § 2) [(Senate Bill 775)], effective January 1, 2022." (*People v. Coley* (2022) 77 Cal.App.5th 539, 544 (*Coley*).) Senate Bill 775 resolved the split of authority and amended section 1172.6 in various respects. "As relevant here, Senate Bill 775 amended section [1172.6] to clarify that 'persons who were convicted of attempted murder . . . under . . . the natural and probable consequences doctrine are permitted the same

12

relief as those persons convicted of murder under the same theor[y].' "[9] (*People v. Whitson* (2022) 79 Cal.App.5th 22, 30.)

"We independently review a trial court's determination on whether a petitioner has made a prima facie showing." (*People v. Harden* (2022) 81 Cal.App.5th 45, 52.)

2. Attempted Murder Law

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*); see also *People v. Mumin* (2023) 15 Cal.5th 176, 190 (*Mumin*); *People v. Scott* (1997) 15 Cal.4th 1188, 1213.) An intent to kill is shown if the assailant either desires the death of the victim or knows to a substantial certainty that death will occur as the result of the assailant's action. (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

In *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), our Supreme Court held that "the doctrine of transferred intent does not apply to attempted murder. Defendant's guilt of attempted murder must be judged separately as to each alleged victim." (*Id.* at p. 331; see also *Mumin*, *supra*, 15 Cal.5th at p. 191.) Put differently: "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland*, at p. 328.)

The *Bland* court further explained that, notwithstanding the inapplicability of transferred intent, a "defendant may be convicted of the attempted murders of any

---

[9] Senate Bill 775 also "address[ed] various aspects of the petition procedure, including the petitioner's right to counsel, the standard for determining the existence of a prima facie case, the burden of proof at the hearing to determine whether a petitioner is entitled to relief, and the evidence a court may consider at that hearing." (*Birdsall*, *supra*, 77 Cal.App.5th at p. 865; see Stats. 2021, ch. 551, §§ 1, 2.)

[person] within the kill zone, although on a concurrent, not transferred, intent theory." (*Bland*, *supra*, 28 Cal.4th at p. 331; see also *Mumin*, *supra*, 15 Cal.5th at p. 191.)

"*Bland*'s adoption of the kill zone theory meant that a prosecutor charging attempted murder in a multivictim case had an additional, alternative ground by which to prove the requisite intent to kill. Under appropriate facts, the prosecutor could attempt to show either that the defendant's intent to kill one or more alleged victims arose independently of his actions toward any other victim, or that the defendant's intent to kill an untargeted victim arose concurrently with his intent to kill a primary target." (*People v. Canizales* (2019) 7 Cal.5th 591, 603 (*Canizales*).)

In *Canizales*, our Supreme Court "reaffirmed *Bland*'s concurrent intent theory but articulated its contours and limitations" and "explained how the theory relates to proving the specific intent to kill required for attempted murder." (*Mumin*, *supra*, 15 Cal.5th at p. 192.) The *Canizales* court clarified "that a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm – that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death – around the primary target[;] and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at pp. 596–597; see *id*. at p. 609 [" '[w]ithout a primary target, there cannot be concurrent intent because there is no primary intent to kill as to which the intent to kill others could be concurrent.' "].)

The *Canizales* court further noted that "past appellate court opinions articulating the kill zone theory are incomplete to the extent that they . . . imply that a jury need not find a defendant intended to kill everyone in the kill zone as a means of killing the

14

primary target, even if their description of the theory is otherwise consistent with our opinion here." (*Canizales*, *supra*, 7 Cal.5th at p. 607, fn. 5; see, e.g., *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023.)

Section 1172.6 "applies by its terms only to attempted murders based on the natural and probable consequences doctrine." (*Coley*, *supra*, 77 Cal.App.5th at p. 548.) "Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852; see also *People v. Romero and Self* (2015) 62 Cal.4th 1, 42; *People v. Favor* (2012) 54 Cal.4th 868, 874; *People v. Miranda* (2011) 192 Cal.App.4th 398, 407–408.)

When a defendant is "found guilty of attempted murder under a natural and probable consequences theory of liability, the 'intent to kill' was imputed onto [the defendant] from the actual killer or perpetrator." (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1007.) "Because section 188, subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable consequences doctrine cannot prove an accomplice committed attempted murder. Accordingly, the natural and probable consequences doctrine theory . . . is now invalid." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)

Although a defendant can no longer be held liable for attempted murder based on the natural and probable consequences doctrine, under current law, "[d]irect aiding and

abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775." (*Coley*, *supra*, 77 Cal.App.5th at p. 548.) "To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' [Citations.] In addition, . . . the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee*, *supra*, 31 Cal.4th at pp. 623–624; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*); *People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 ["[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea."].)

3. Pleas of Guilty/No Contest

" 'A guilty plea [or plea of nolo contendere] admits every element of the charged offense.' " (*People v. Rivera* (2021) 62 Cal.App.5th 217, 234 (*Rivera*).) However, a "defendant is not required to personally admit the truth of the factual basis of the plea, which may be established by defense counsel's stipulation to a particular document, such as a police report or a preliminary hearing transcript." (*People v. French* (2008) 43 Cal.4th 36, 50–51; see *People v. Thoma* (2007) 150 Cal.App.4th 1096, 1104 [a general

16

stipulation to a factual basis for a plea does not amount to an admission of particular facts].)

"In some [plea] cases, the record may reveal that a defendant admitted *more* than the elements of the offense charged, and such additional admissions may preclude relief under section [1172.6]." (*Rivera*, *supra*, 62 Cal.App.5th at p. 234.) A defendant's admissions in entering a guilty plea "pursuant to a negotiated plea" are binding. (*People v. Romero* (2022) 80 Cal.App.5th 145, 153 (*Romero*); cf. *Rivera*, at p. 235 ["absent an indication that a defendant admitted the truth of particular facts, the stipulation to a factual basis for the plea does not 'constitute[] a binding admission for all purposes' "].)

B. *Analysis*

We begin with Villagomez's contention that even if his stipulation can properly be considered to determine the theory underlying his attempted murder conviction, the trial court erred in finding that the stipulation established his ineligibility for resentencing under section 1172.6 as a matter of law.[10] Villagomez asserts that his admission to harboring an " 'intent to kill at least one' " of the two people who were shot at "left open the possibility that he intended to kill John Doe #2 or Jane Doe #1." He argues further that, "[b]ecause the doctrine of transferred intent does not apply to attempted murder, this stipulation therefore does not establish that [his] liability for the attempted murder of John Doe #1 rested solely on direct aiding and abetting. Instead, it encompassed both the

---

[10] As detailed *ante* (pt. I.B), the stipulation reads as follows: "I agree and stipulate that there is a factual basis for all charges, special allegations and enhancements to which I am pleading guilty or no contest, and the factual basis is that on April 17, 2013, I aided and abetted in the shooting, with a semi-automatic firearm, of two people in King City with the intent to kill at least one of them and I did this for the benefit of, at the direction of or in association with the Norte[ñ]o criminal street gang with the specific intent to promote, further or assist criminal conduct by gang members causing this offense to be felony conduct which would also be a violation of Penal Code section 186.22. The details are described in King City Police report 130433."

17

natural and probable consequences doctrine and the 'kill zone' theory that was subsequently disapproved by *Canizales*."

The Attorney General counters that the information and Villagomez's plea demonstrate that he admitted his intent to kill applied only to John Doe #1. More specifically, the Attorney General asserts that "[b]ecause the information alleged the attempted murder of John Doe #1 and no other attempted murder, it is implausible that the prosecution was proceeding on the basis that [Villagomez] really intended to kill a different victim, given that he was not charged with attempted murder as to any of the other victims in the area at the time." The Attorney General further argues that "it is logical to infer that [Villagomez]'s admission that he acted with the intent to kill 'at least' one of the two people he shot at meant that he intended to kill 'at least' John Doe #1."

We agree with Villagomez that we must reverse the trial court's denial of his petition at the prima face stage. Under the standard articulated by our Supreme Court in *Strong*, neither the stipulation nor any other information in the record conclusively establishes as a matter of law (without resort to factfinding) that Villagomez admitted to harboring an intent to kill John Doe #1 when he pleaded no contest to attempted murder.

In count 1, the information generically charged Villagomez and Zuniga with attempted murder, alleging that they "did unlawfully, and with malice aforethought [attempt to] murder John Doe #1" (some capitalization omitted).[11] Thus, the charge itself did not limit the district attorney from convicting Villagomez on any available theory of attempted murder liability, which at the time of Villagomez's no contest plea could have included liability under the natural and probable consequences doctrine or the concurrent

---

[11] We add the words "attempt to" in the quotation because it appears that those words were inadvertently omitted from count 1 of the amended information. Both the complaint and the initial information filed in this case alleged that Villagomez and Zuniga did "unlawfully, and with malice aforethought *attempt to* murder John Doe #1" (italics added & some capitalization omitted). It is undisputed that John Doe #1 was not killed.

intent/kill zone theory. (See *People v. Flores* (2022) 76 Cal.App.5th 974, 987 (*Flores*); *People v. Eynon* (2021) 68 Cal.App.5th 967, 977–978; *Rivera*, *supra*, 62 Cal.App.5th at p. 233.)

As mentioned *ante* (pt. I.B), the record does not contain a reporter's transcript from Villagomez's change of plea proceeding. Nevertheless, Villagomez's stipulation states a personal factual admission providing the factual basis for his no contest plea. Thus, we must consider whether the stipulation conclusively demonstrates that he admitted to acting with a specific intent to kill John Doe #1. (See *Romero*, *supra*, 80 Cal.App.5th at p. 153.)

In his stipulation, Villagomez admitted that he "aided and abetted the shooting . . . of two people in King City with the intent to kill at least one of them." We agree with Villagomez that his "stipulation is ambiguous." The stipulation does not state that Villagomez necessarily harbored an intent to kill John Doe #1. The phrase "at least one of" the two people means that Villagomez could have intended to kill either of the two people, or both when he aided and abetted the shooting of them.[12] In other words, Villagomez's stipulation does not patently demonstrate that John Doe #1 was necessarily a victim for whom Villagomez harbored an intent to kill while he aided and abetted the shooting of John Doe #1 and John Doe #2.

We are not persuaded by the Attorney General's argument that the singular attempted murder charge as to John Doe #1 makes it "implausible that the prosecution was proceeding on the basis that [Villagomez] really intended to kill a different victim." Although it is undeniable that the district attorney eschewed charging attempted murder for anyone other than John Doe #1, the generic attempted murder charge here left open the possibility of all potential theories of liability. Given that context, Villagomez's

---

[12] "[A]t least" means "at the minimum." (Merriam-Webster's Collegiate Dict. (11th ed. 2009) p. 708, col. 2.)

19

stipulation matters most to determining whether he in fact admitted to harboring an intent to kill John Doe #1 when pleading no contest to count 1.

As explained *ante*, the words of the stipulation are not so narrowly tailored as to limit the intent to kill to John Doe #1 and allowed for Villagomez having harbored an intent to kill someone other than John Doe #1 when he "aided and abetted in the shooting . . . of two people."

Regarding whether the stipulation encompassed the natural and probable consequences doctrine, Villagomez argues that the "target offenses" for his liability "could have been the assault with a semiautomatic firearm of John Doe #2 charged in count four, the assault with a firearm of Jane Doe #1 charged in count five, and/or the shooting at an inhabited dwelling charged in count two." We question whether the stipulation can reasonably be construed to include Villagomez aiding and abetting a target offense committed against Jane Doe #1 or involving the shooting at an inhabited dwelling. Villagomez's plea agreement included pleas of no contest to only two charges that concerned John Doe #1 (count 1) and John Doe #2 (count 4). Moreover, by including the phrase "I aided and abetted the shooting . . . of two people," the stipulation seemingly limited the relevant victims to the two people hit by bullets, i.e., John Doe #1 and John Doe #2 (not Jane Doe #1). Thus, the most plausible interpretation of the stipulation is that it concerns only Villagomez's aiding and abetting the shooting of John Doe #1 and John Doe #2.

Nevertheless, an assault with a firearm can serve as the target offense that Villagomez aided and abetted which, in turn, could make him liable for the nontarget, attempted murder offense under the natural and probable consequences doctrine.[13] (See *People v. Medina* (2009) 46 Cal.4th 913, 916, 919–920.)

---

[13] The information charged Villagomez with assault with a firearm against John Doe #1 (count 3). That count, however, was dismissed as part of the plea deal. The

As discussed *ante*, the phrase "intent to kill at least one of them" means that Villagomez admitted harboring an intent to kill either John Doe #1 or John Doe #2, or both while aiding and abetting the shooting of them. If Villagomez harbored an intent to kill John Doe #1, or both John Doe #1 and John Doe #2 while aiding and abetting the shooting of John Doe #1, then Villagomez would be liable as a direct aider and abettor of an attempted murder of John Doe #1 and, thus, ineligible for relief under section 1172.6. In the latter scenario, wherein Villagomez intended to kill both victims, Villagomez could also have been held liable as a direct aider and abettor for an attempted murder of John Doe #2 (regardless of the shooter's personal culpability as to the victim), but that crime was not charged. (See *McCoy*, *supra*, 25 Cal.4th at p. 1122 [explaining that if an aider and abettor's "mens rea is more culpable than another's, [the aider and abettor]'s guilt may be greater even if the other might be deemed the actual perpetrator"].)

However, there is another possible scenario under the stipulation in which the natural and probable consequences doctrine provides a basis for Villagomez's guilt of the nontarget, attempted murder offense against John Doe #1. If Villagomez harbored only an intent to kill John Doe #2 while aiding and abetting the shooting of John Doe #1 and John Doe #2, Villagomez could be liable for the attempted murder of John Doe #1 (without harboring an intent to kill him) by aiding and abetting a target offense of assault

---

elements of an assault with a firearm are: (1) the defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did the act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (4) when the defendant acted, he had the present ability to apply force with a firearm to a person. (See *People v. Golde* (2008) 163 Cal.App.4th 101, 121; §§ 240, 245, subd. (a)(2); CALCRIM No. 875.) "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.)

21

with a firearm on John Doe #1. Put differently, Villagomez would be liable for the attempted murder of John Doe #1 based on a shooting perpetrated by another person, even without having personally harbored an intent to kill John Doe #1, because the attempted murder is a natural and probable consequence of the assault with a firearm on John Doe #1 that Villagomez knowingly aided and abetted. Under this scenario, Villagomez would be eligible for section 1172.6 relief.

Because we conclude that Villagomez's stipulation encompassed potential liability for attempted murder under the natural and probable consequences doctrine, we need not address Villagomez's additional argument that his stipulation also allowed for the imputation of an intent to kill under the concurrent intent/kill zone theory as construed by precedent extant at the time of his plea (and subsequently disapproved by our Supreme Court in *Canizales*).

In addition to arguing that we should affirm the trial court's ruling based on the information and Villagomez's plea, the Attorney General points to the preliminary hearing as support for a conclusion that Villagomez "intended to kill John Doe #1, not the others." The Attorney General notes that the preliminary hearing evidence includes testimony that "John Doe #1 was a former member of the rival Sureño gang, and Nava had gotten into a fight with a different Sureño gang member at school that day." In addition, the Attorney General asserts "there was no dispute that [Villagomez] acted with the requisite intent to kill John Doe #1" and "there was no suggestion that the prosecution was proceeding on an indirect theory of liability."

Courts of Appeal are divided on the extent to which a trial court may rely on the preliminary hearing transcript to deny a petition at the prima facie showing stage. (Cf. *People v. Nguyen* (2020) 53 Cal.App.5th 1154, 1166–1168 with *Flores*, *supra*, 76 Cal.App.5th at pp. 988–992; see also *People v. Davenport* (2021) 71 Cal.App.5th 476, 481–484.) Nevertheless, it is well established that the trial court may not engage in factfinding at the prima facie stage. (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

22

Here, as the Attorney General acknowledges, the trial court did not rely on the preliminary hearing transcript when making its finding of Villagomez's ineligibility for relief under section 1172.6. In fact, the trial court stated its agreement with Villagomez's defense counsel that based on the preliminary hearing, "there are a variety of theories of liability that could get to an attempted murder charge or a [section] 245 charge under a natural and probable consequence theory aiding and abetting a lesser crime." We concur with the trial court's assessment of the preliminary hearing evidence.

Moreover, the Attorney General does not point us to any instance in the preliminary hearing where the district attorney limited his theories of Villagomez's liability on the attempted murder count. To the contrary, at the close of the preliminary hearing evidence, the district attorney argued broadly that "it is clear that . . . this type of crime was done in relation to a criminal street gang," "the defendants were active participants during the commission of this crime, and it was committed in concert." Hence, even if we were to rely on the preliminary hearing transcript, it does not conclusively show that the district attorney relinquished the natural and probable consequences doctrine as a theory of liability for count 1.

In addition, we disagree with the Attorney General's assertion that at the preliminary hearing, Villagomez did not dispute that he acted with the intent to kill John Doe #1. Although Villagomez's defense counsel focused his argument at the close of the evidence on "the gang nature of the shooting" and "the gang accusations," defense counsel challenged codefendant Zuniga's statements about the crime (presented through Officer Perez's testimony) as "inherently unreliable" and asked the court to "discharge [Villagomez] as to those aspects of the crime related to gang membership and motive." Given that Zuniga's statements implicating Villagomez were a crucial part of the prosecution's proof on Villagomez's actions and mental state, we do not view defense counsel's argument as failing to dispute that Villagomez harbored an intent to kill John Doe #1.

23

We decide that the preliminary hearing record does not irrefutably establish that the natural and probable consequences doctrine was inapplicable to this prosecution or that Villagomez aided and abetted the shooting with an intent to kill John Doe #1. Therefore, any determination at the prima facie stage that relies on the preliminary hearing record to find that Villagomez harbored such an intent to kill would impermissibly constitute " 'factfinding involving the weighing of evidence or the exercise of discretion.' "[14] (*Lewis*, *supra*, 11 Cal.5th at p. 972.)

Because Villagomez's petition alleged the facts necessary for relief under section 1172.6 (§ 1172.6, subds. (a)–(c)), and the record before us does not conclusively establish that he is ineligible for relief as a matter of law, we conclude that Villagomez's petition made a prima facie showing of entitlement to relief. (See *Lewis*, *supra*, 11 Cal.5th at pp. 970–972; § 1172.6, subd. (c); see also *Strong*, *supra*, 13 Cal.5th at p. 720.) We thus reverse the trial court's September 2022 order and remand the matter to the trial court with directions to issue an order to show cause and hold further proceedings under section 1172.6.[15] We express no opinion on whether Villagomez's section 1172.6 petition should be granted or denied following further proceedings.

---

[14] Having decided that reliance on the preliminary hearing evidence in this case would amount to improper factfinding under *Lewis*, we need not address Villagomez's further argument that it would be improper to rely on codefendant Zuniga's hearsay statements because that evidence would be inadmissible at any evidentiary hearing held under section 1172.6, subdivision (d)(3). (See *Flores*, *supra*, 76 Cal.App.5th at p. 988, fn. 9.)

[15] Having concluded that the trial court's order denying Villagomez's petition must be reversed notwithstanding the court's consideration of Villagomez's stipulation, we need not address Villagomez's additional claims that we should disregard his stipulation and adopt "*Descamps*' categorical approach in the context of section 1172.6 proceedings at the prima facie stage" and that reliance on his stipulation to deny relief at the prima facie stage violates section 1016.8.

### III.  DISPOSITION

The trial court's September 21, 2022 order is reversed, and the matter is remanded with directions to issue an order to show cause and conduct further proceedings in accordance with Penal Code section 1172.6.

_____
                                    Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.



_____
Bromberg, J.



**H050412**
*People v. Villagomez*